UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OUTER CAPE LOBSTERMEN'S ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC STATES MARINE FISHERIES COMMISSION and DANIEL McKIERNAN, in his capacity as Director of the Massachusetts Division of Marine Fisheries,<br><br>Defendants. | Civil Action No. 98-CV-10165-WGY<br><br>**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND ADMINISTRATIVE STAY** |

NOW COMES the Plaintiff, Outer Cape Lobstermen's Association, by and through its undersigned attorneys, and respectfully submits this Memorandum of Law in Support of the Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and Administrative Stay.

**INTRODUCTION**

The lobster fishery is a cornerstone of Massachusetts' economic, cultural, and historical identity, sustaining generations of families and coastal communities. The Outer Cape Lobstermen's Association ("Plaintiff"), representing dedicated commercial fishermen, has responsibly harvested lobster in the Outer Cape Cod Lobster Conservation Management Area ("OCC") for decades, adhering to a carefully balanced regulatory framework established by a 2000 settlement agreement. This framework, which permits fishing of most V-Notched lobsters in exchange for stricter gauge size requirements, has proven effective in conserving lobster stocks while supporting the livelihoods of OCC fishermen. Now, the Atlantic States Marine Fisheries Commission ("ASMFC") and the Massachusetts Division of Marine Fisheries ("DMF") (the "DMF" and "ASMFC" are collectively

1

referred to as "Defendants") threaten this delicate balance with an arbitrary and unlawful amendment to ASMFC's Addendum and to 322 CMR 6.02, effectively banning V-Notch fishing in the OCC. This regulation – which, as admitted at a public hearing by an ASMFC Board Member and the Chairman of Massachusetts Fisheries Advisory Commission resulted from political horse trading – is driven not for conservation needs but by a misguided push for uniformity, violates federal law, unconstitutionally commandeers state authority, and imperils the economic survival of the Plaintiff's members. This simply is not appropriate fishery management. Plaintiff urgently seeks a Temporary Restraining Order, Preliminary Injunction, and Administrative Stay to halt this illegal and devastating regulation before it takes effect on July 1, 2025, and to preserve the status quo pending judicial review.

## FACTS

Plaintiff's members are Massachusetts-licensed commercial fishermen who fish in the OCC. [Declaration of Brendan Adams ("Adams Decl.") ¶ 3.] The DMF is responsible for overseeing the lobstering activity of Massachusetts-licensed lobstermen in the Commonwealth's waters. [*Id.* ¶ 7.] Federal waters, including those off the coast of Massachusetts, are managed by the ASMFC pursuant to the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. § 5101 et seq. ("ACFCMA"). [*Id.* ¶ 8.] Massachusetts' coastal waters are divided into four Lobster Conservation Management Areas ("LCMA"), each of which has its own body of rules and regulations. [*Id.* ¶ 3.] There are only 67 Commonwealth-licensed lobster trap fishers in the OCC, 40 of whom do not possess a federal permit. [*Id.* ¶¶ 5-6.]

In 2000, the Commonwealth entered a settlement agreement (the "OCC Settlement") with Plaintiffs in this action that established a regulatory regime for the OCC distinct from those of the other LCMA. [Adams Decl. ¶ 9.] Under the original OCC Settlement, OCC lobstermen, unlike their counterparts elsewhere, were not required to V-Notch female lobster catches, and were permitted to fish V-Notched lobster. [*Id.* ¶ 9.] In exchange, the OCC was subject to a 3 5/16" minimum gauge size requirement, greater than the 3 1/4" minimum in place in the other LCMA. [*Id.* ¶ 9.]

2

Shortly after the OCC Settlement, two DMF marine biologists, one of whom is now DMF's Deputy Director, conducted a review of DMF regulations and concluded that the OCC Settlement's scheme led to a 1.338% increase in egg production, compared to a mere 0.502% increase under the 3 ¼" minimum gauge size and V-Notching requirements. [*Id.* ¶ 11, Ex. A.] Since the minimum gauge was ultimately increased to 3 3/8", the egg production benefits, according to Director Glenn's analysis, increased more than tenfold. In March 2000, DMF's then-Director Philip Coates told the *Cape Cod Times* that:

> [W]e're not going to save the lobster resource with V-notching and a maximum gauge. In my heart, I know the Outer Cape lobstermen are correct. There should be real trap reductions and an increase in the minimum size.

[*Id.* ¶ 12, Ex. B.] In 2003, following a change in DMF leadership, the Parties to the original OCC Settlement agreed to a V-Notch possession rule disallowing OCC lobstermen from possessing "any female lobster that bears a notch or indentation in the base of the flipper that is at least as deep as ¼ inch and tapering to a sharp point *without setal hairs*." [*Id.* ¶ 10;] 322 CMR 6.02(5)(e)(3) (2003) (emphasis added). Under the prior rule, only a small portion of the OCC lobster catch fell under the restriction, and compliance was easily enforceable. [*Id.* ¶ 14.] OCC lobstermen operated under this permissive standard for over two decades without issue.

Then, on January 24, 2025, DMF published "Regulatory Updates – 2024 Q3 and Q4," announcing changes to the existing regime of lobstering regulation codified in 322 CMR 6.02. [Adams Decl. ¶ 13, Ex. C.] Under the new rule, DMF sought to greatly expand the V-Notch restrictions applicable to OCC lobstermen in plain violation of the OCC Settlement that had been in place for over twenty years. [*Id.* Ex. C.] It provides:

> Effective for the 2025 permit renewal season, permit holders authorized to fish traps in Lobster Conservation Management Areas (LCMAs) 1 and 3 will no longer be issued annual trap tags in excess of their trap allocation (i.e., an additional 10%) to pre-emptively cover trap loss. Then, the first in a series of changes to biological measures will go into effect on July 1, 2025 when the LCMA 1 minimum carapace size will be increased by 1/16" from 3 ¼" to 3 5/16" and a standard maximum carapace size of 6 ¾" and *v-notch possession*

3

> *rule of 1/8" depth with or without setal hairs will be adopted for the Outer Cape Cod LCMA. Currently, the Outer Cape Cod LCMA has disparate rules for state-only permit holders and federal permit holders and this action brings the rules affecting state-only permit holders in line with the current rules for federal permit holders.*

[*Id.* Ex. C, at 1 (emphasis added).]

The proposed changes will significantly reduce the total lobster catch in the OCC, and determining which lobsters are subject to the new restrictions has already proven difficult. [Adams Decl. ¶ 14.] Nevertheless, DMF claimed that it was constrained to expand the prohibition on fishing V-Notched lobsters in the OCC to comply with Addenda XXVII and XXXI to the Interstate Fishery Management Plan for American Lobster ("FMP"). [*Id.* ¶ 12, Ex. C, at 1.] In its Small Business Impact Statement, DMF stated that many areas of inquiry were inapplicable because "the prescribed regulations are required by and designed to comply with federal law at 16 U.S.C. 5100." [*Id.* ¶ 15, Ex. D.]

The ACFCMA is the federal law purportedly underpinning DMF's recent regulatory change. [Adams Decl. ¶ 16.] Under the ACFCMA, the Secretary of Commerce develops fishery management plans to support the ASMFC. [*Id.* ¶ 16.] Such plans guide the implementation of regulations governing fishing in the federal exclusive economic zone. 16 U.S.C. § 5103 (b)(1). If a fishery "is located in both State waters and the exclusive economic zone, the [ASMFC] shall consult with appropriate Councils to determine areas where such coastal fishery management plan may complement Council fishery management plans." 16 U.S.C. § 5104 (a)(1).

The American Lobster fishery is managed under Amendment 3 to the FMP and its 32 Addenda. [Adams Decl. ¶ 17.] In May 2023, ASMFC approved Addendum XXVII to the FMP, ostensibly to further the conservation of lobster stock in the Gulf of Maine/Georges Bank. [*Id.* ¶ 18.] Addendum XXVII imposed new gauge and escape vent size regulations, styled as an effort "to improve consistency of measures across the GOM/GBK stock." [*Id.* ¶ 19.] In February 2025, ASMFC approved Addendum XXXI, which postponed implementation of Addendum XXVII until July 1, 2025. [*Id.* ¶

4

20.] Then, in April 2025, ASMFC published proposed amendments to Addendum XXVII which would prohibit fishing V-Notched lobster in the OCC. [*Id.* ¶ 21.]

In response, on April 18, 2025, DMF Director Daniel McKiernan issued a Memorandum titled "Emergency Rule Making to Implement Addendum XXXII to the American Lobster Management Plan." [Adams Decl. ¶ 22, Ex. E.] Addendum XXXII repeals Addendum XXVII's gauge and escape vent size standards, but not the restriction of V-Notching in the OCC. [*Id.* ¶ 23.] In his Memorandum, Director McKiernan admitted that the purpose of the new V-Notch prohibition was not to further the conservation of the lobster stock, but to promote both inter-state and intra-state uniformity of lobstering regulation. [*See id.* ¶ 22  Ex. E, at 7-8.]

ASMFC adopted Addendum XXXII in May 2025 in response to political pressure from Maine and New Hampshire, both of which had refused to comply with the novel standards set forth in Addendum XXVII. [Adams Decl. ¶ 24.] That same month, Massachusetts' delegation to ASMFC moved to amend Addendum XXXII to lift the prohibition on V-Notching in the OCC. [*Id.* ¶ 25.] Delaware's delegation refused to second the motion, citing not environmental or sustainability concerns, but rather its desire for "an increase in their commercial striper" limit. [*Id.* ¶ 26.] Indeed, at this May 2025 meeting, a member of Delaware's delegation stated to the Commissioner of the Massachusetts Fisheries Advisory Commission and ASMFC Board Member that Delaware would not second Massachusetts' motion to amend Addendum XXXII to remove the V-Notching mandate in the OCC because "they wanted an increase in their commercial striper." This same ASMFC Board Member stated that "it gets very political at the Commission table."[*Id.*]

On May 29, 2025, the Massachusetts Marine Fisheries Advisory Committee rejected DMF's attempt to permanently enact Director McKiernan's Emergency Rule Making to Implement Addendum XXXII. [*Id.* ¶¶ 28-30.] At its May 29, 2025 meeting, several Massachusetts Marine Fisheries Advisory Commission members expressed opposition to Director McKiernan's emergency rulemaking to

5

implement Addendum XXXII, primarily on the grounds that it was unfair to OCC fishermen. [*Id.* ¶ 30.]

As it stands, beginning on July 1, 2025, Plaintiff's members will not be permitted to fish V-Notched lobsters, and may be required to V-Notch lobster catches in accordance with 322 CMR 6.02(5)(d)(3)(b). [*Id.* ¶ 32.] Plaintiff's members will suffer a significant reduction in their catch if the prohibition takes effect, which will cause Plaintiff's members severe economic hardship and will likely put many of them out of business. [*Id.* ¶¶ 33-34.]

Under Amendment 3 to the FMP, before enacting any regulatory change to LCMA, the "jurisdictions adjacent to the area of concern" must consult with a Lobster Conservation Management Team ("LCMT") to develop a proposed management plan, considering "[c]oncerns regarding conservation, enforcement, administration, and socio-economic implications." [*Id.* ¶ 35.] The final proposal is then to be submitted to ASMFC. [*Id.*] At no point in the process of adopting its revisions to 322 CMR 6.02 did DMF consult with an LCMT or ASMFC, nor did it conduct an economic impact analysis studying the specific effect of the new regulations on OCC lobstermen. [*Id.* ¶ 36.]

## **STANDARD OF REVIEW**

In general, "[t]rial courts have wide discretion" in deciding whether to grant preliminary injunctive relief. *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009). A temporary restraining order ("TRO") is extraordinary relief that is issued without notice to the adverse party. Fed. R. Civ. P. 65(b)(1); *Lucero v. Coppinger*, 2023 WL 363592, at *2 (D. Mass. Jan. 23, 2023). To succeed on a motion for a TRO, the moving party must provide "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). A TRO may only be issued for a period of up to 14 days. Fed. R. Civ. P. 65(b)(2).

6

The standard for granting a TRO is the same as that for granting a preliminary injunction. *Orkin v. Albert*, 557 F. Supp.3d 252, 256 (D. Mass. 2021) (citing *Bourgoin v. Sebelius*, 928 F. Supp.2d 258, 267 (D. Me. 2013)). In evaluating a motion for a TRO or a preliminary injunction, the Court considers four factors: "(1) the likelihood that the movant will succeed on the merits; (2) the possibility that, without an injunction, the movant will suffer irreparable harm; (3) the balance of relevant hardships between the parties favors relief; and (4) the effect of the court's ruling on the public interest." *Orkin*, 557 F. Supp.3d at 256-57 (citing *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009)).

Once a party has initiated proceedings challenging an agency action, it may seek an administrative stay pending resolution of the case. 5 U.S.C. § 705; *Massachusetts Fair Housing Ctr. v. U.S. Dep't of Housing and Urban Dev.*, 496 F. Supp.3d 600, 609 (D. Mass. 2020). Courts apply the same standard for evaluating a stay as for a TRO or a preliminary injunction. *Id.* at 609.

## **LEGAL ARGUMENT**

The emergency regulations in 322 CMR 6.02 made to comply with Amendment XXVII are unconstitutional, arbitrary, and capricious. Implementation and enforcement of the new regulations will cause irreparable harm to Plaintiff's members, substantially reducing their lobster catch and threatening their very livelihoods. If the new regulations come into effect, Plaintiff's members will be completely without recourse to seek compensatory damages for the significant monetary harm that will follow.

Moreover, the irreparable harm Plaintiffs will suffer far outweighs any potential harm to Defendants that might issue from this Court's grant of Plaintiffs' Motion. Despite Defendants' assertions, Amendment XXVII and 322 CMR 6.02 do not advance the conservation of lobster stock. Indeed, DMF's own former Director, and its current Deputy Director, have both admitted that V-Notching does not contribute to the preservation of the lobster stock.

Finally, an arbitrary and capricious regulation is never in the public's interest. Far from adversely affecting the public, Plaintiff's requested relief will advance the public's interest in not being subjected to illegal regulation.

Accordingly, this Court should issue a Temporary Restraining Order and grant Plaintiff's Motion for Preliminary Injunction against Defendants' enforcement of 322 CMR 6.02.

**A. Plaintiff is Likely to Succeed on the Merits Because ASMFC Unconstitutionally Commandeered DMF to Enact 322 CMR 6.02, and Because 322 CMR 6.02 is Contrary to Law, Arbitrary, Capricious, and Unsupported by Substantial Evidence.**

1. *ASMFC Unconstitutionally Commandeered DMF to Pass and Enforce Illegal Regulations*.

It is well established that the Tenth Amendment bars Congress from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Haaland v. Brackeen*, 599 U.S. 255, 281–82 (2023) (citing *Printz v. United States*, 521 U.S. 898, 935 (1997)). While Congress is free to employ incentives to encourage a particular State action, simply directing the Commonwealth to adopt and/or enforce regulations amounts to "outright coercion" manifestly forbidden by the Constitution. *New York v. United States*, 505 U.S. 144, 166 (1992). And for good reason: "where the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished . . . due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation." *Id.* (citing La Pierre, Political Accountability in the National Political Process—The Alternative to Judicial Review of Federalism Issues, 80 Nw.U.L.Rev. 577, 639–665 (1985)). Such diminished accountability is precisely what the Framers sought to avoid when they decided to "withhold from Congress the power to issue orders directly to the States," a decision that was "fundamental" to the proper functioning of the federal system the Framers envisioned. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–74 (2018).

8

Nevertheless, through its adoption of Addenda XXVII and XXXI, ASMFC has usurped the Commonwealth's authority to regulate fishing in its own waters, thereby blurring the lines between federal and State power. *See Manchester v. Massachusetts*, 139 U.S. 240, 265 (1891) (recognizing a State's power to regulate fishing within its territorial waters absent federal preemption). Such egregious usurpation is commandeering in its purest form, and the DMF regulations implementing the Addenda cannot pass constitutional muster. *See Printz v. United States*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

Purportedly out of concern for the preservation of the lobster stock, ASMFC developed Addendum XXVII, which is designed to standardize the rules governing lobster fishing across the Commonwealth's LCMA. [Adams Decl. ¶¶ 18-20.] It was approved in May 2023, whereupon ASMFC directed the Commonwealth to implement the new standards, including the V-Notch prohibition, by May 2024. [*Id.*] The Massachusetts delegation voted against Addendum XXVII because it opposed the imposition of the new V-Notch rule on OCC lobstermen. [*Id.* ¶ 25.]

Nevertheless, DMF proceeded to implement emergency measures to enact ASMFC's changes. [*Id.* ¶¶ 13, 22.] DMF believed it had no choice in the matter, stating that "the prescribed regulations are required by and designed to comply with federal law at 16 U.S.C. 5100." [*Id.* ¶ 15.] Indeed, had DMF failed to comply, Massachusetts feared that lobstering in Massachusetts' waters would have been suspended altogether. *See* 16 U.S.C. § 5106(c); *Rhode Island Fishermen's Alliance, Inc. v. Rhode Island Dep't of Env't Mgmt.*, 585 F.3d 42, 46 (1st Cir. 2009) ("If a state fails to comply with an approved plan, the Commission may notify the Secretary of Commerce, who has the power to impose a moratorium on fishing the relevant species in the waters of the noncompliant state.").

ASMFC put DMF in an unenviable position: either implement the V-Notch prohibition opposed by the Commonwealth's own delegation, or face the total suspension of an industry vital to

9

the Massachusetts economy. *See Rhode Island Fishermen's Alliance, Inc.*, 585 F.3d at 46. This was not an incentive, but a blatant attack on the Commonwealth's sovereign power to prescribe rules for its territorial fisheries. *See New York*, 505 U.S. at 176 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all."). The V-Notch rule is thus a product of outright coercion, upsetting the balance of federal and State power prescribed by the Tenth Amendment. *See Murphy*, 584 U.S. at 470–74. This Court must stop ASMFC's unlawful attempt to commandeer DMF, impose its federal will on OCC lobstermen, and enforce 322 CMR 6.02 in plain violation of the Constitution and the OCC Settlement.

       2. *ASMFC Failed to Follow its Own Requirements in Imposing the V-Notch Prohibition.*

Even if the Constitution permitted ASMFC to conscript DMF into service of its own regulatory objectives, the ACFCMA does not. The ACFMCA controls this action; Plaintiffs, Defendants and this Court are bound by its plain and unambiguous mandate. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 8 (1st Cir. 2007) ("Statutory interpretation begins with the language of the statute. Where…that language is clear and unambiguous, the inquiry is at an end."). The new V-Notch prohibition directly contravenes ACFMCA's requirements and is therefore illegal. *See Bennett v. Murphy*, 166 F. Supp.3d 128, 139 (D. Mass. 2016) (holding that a court may set aside agency action that is contrary to law); *cf. Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (noting a reviewing court's responsibility to ensure that a "decision to promulgate [a] fishery regulation [is] consonant with…statutory powers.").

The ACFCMA clearly lays down the procedure for regulating the lobster fishery. *See generally* 16 U.S.C. §§ 5103–5106. It provides that "the Secretary [of Commerce] in cooperation with the Secretary of the Interior shall develop and implement a program to support the interstate fishery management efforts of [ASMFC]." *Id.* § 5103(a). Concerning the development of fishery management plans for fisheries within both State waters and the federal exclusive economic zone, the ACFCMA

provides that, "[ASMFC] shall consult with appropriate Councils to determine areas where such coastal fishery management plan may complement Council fishery management plans." *Id.* § 5104(a)(1).

Consultation within the meaning of the ACFCMA requires more than a perfunctory solicitation of comments from the concerned Councils as members of the general public. *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002). This is so because, without a more meaningful exchange, "the consultation requirement would be rendered nugatory." *Id.* In addition, "[c]onsultation with the relevant councils is key in the Secretary's development of effective regulations because the councils have valuable insight and expertise." *Id.*

ASMFC did not engage in any discussion with the appropriate Councils before charging forward with Amendment XXVII. [Adams Decl. ¶ 4.] Had ASMFC heeded the "insight and expertise" of the Massachusetts delegation, it may have recognized the V-Notch rule for what it is: a misguided attempt to disturb a regulatory framework that has done more to protect the lobster spawning stock over the last 25 years than the new regime ever could. [*See* Adams Decl. Ex. A; Ex. B.] Instead, ASMFC adopted a massive change to the regulation of lobster fishing in the OCC without any input whatsoever from the Secretary or appropriate Councils. [Adams Decl. ¶ 34.] In so doing, it impermissibly bypassed a "key" component of the ACFMA. *Campanale & Sons*, 311 F.3d, at 120. Now, OCC lobstermen have been commanded to sacrifice their livelihoods in furtherance of ASMFC and DMF's quixotic crusade to save the lobster by way of the new V-Notch rule that DMF itself admits will not accomplish its goal. [*See* Adams Decl. Ex. A; Ex. B.] This Court must not allow such a fool's errand to continue.

The problems, however, do not end there. Not only did ASMFC fail to follow the ACFMCA; it also failed to observe the procedures set forth in the FMP itself. Amendment 3 provides, in pertinent part:

> LCMTs and the jurisdictions adjacent to the area of concern shall be responsible for the development of recommendations for each lobster management area. Adjacent jurisdictions will be responsible for preparing a

11

>management proposal containing said recommendations. Concerns regarding conservation, enforcement, administration, and socio-economic implications should be addressed during this time period. Upon finalization of the management proposal, the area/state contact for each LCMT will forward the proposal to Commission staff for distribution to and review by the Lobster Management Board. Upon receipt of the proposal or during the next scheduled lobster Board meeting, the Board will take action on the management area proposal.

[Adams Decl. ¶ 35.] Neither ASMFC nor DMF ever consulted with a LCMT to develop a management proposal before ASMFC promulgated the Addenda. [Adams Decl. ¶¶ 36-37.] The V-Notch prohibition therefore violates controlling law on two fronts: failing to comply with both the ACFMCA's procedures for implementing management plans and the relevant plan's own requirements. *See Manguriu v. Garland*, 86 F.4th 491, 501 n. 15 (1st Cir. 2023) ("[An] agency must follow its own regulations.")

In failing to follow the procedures set forth in the ACFCMA and Amendment 3, ASMFC and DMF illegally circumvented the safeguards woven into the enabling statutory framework to ensure effective regulation. *See Bennett v. Murphy*, 166 F. Supp.3d 128, 139 (D. Mass. 2016); *Campanale & Sons*, 311 F.3d, at 120. Predictably, the resulting rule is completely incapable of achieving its alleged purpose, i.e., furthering the preservation of the lobster spawning stock biomass. [Adams Decl. Ex. A.] Because ASMFC and DMF did not follow the requisite procedures, 322 CMR 6.02 is unlawful and this Court must enjoin its enforcement. *See Bennett*, 166 F. Supp. 3d at 139.

3. *322 CMR 6.02 Violates the Administrative Procedure Act Because It Is Arbitrary, Capricious, and Unsupported by Substantial Evidence.*

Under the Administrative Procedure Act, courts may set aside an agency action if it is arbitrary and capricious or unsupported by substantial evidence.[1] 5 U.S.C. § 706(2); *Gulluni v. Levy*, 85 F.4th

---

[1] Because ASMFC commandeered DMF to enforce a federal regulatory program through State action, Plaintiffs bring this action under the federal Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. Were this Court to apply the Massachusetts Administrative Procedure Act, the result would be the same. *See Palmer v. Rent Control Bd. of Brookline*, 7 Mass. App. Ct. 110, 115, 386 N.E.2d 1047 (1979) (citations omitted) (holding that the Massachusetts Administrative Procedure Act "follow[s] generally the 'pattern of the Federal A.P.A.' and that "the two acts are

12

76, 82 (1st Cir. 2023). Here, because this is a regulatory promulgation, not a regulatory action, the arbitrary and capricious standard applies. *Id.*[2]

Here, ASMFC and DMF originally claimed the purpose of the V-Notch prohibition was "to provide additional protection of the Gulf of Maine/Georges Bank (GOM/GBK) spawning stock biomass." [Adams Decl. ¶ 19.] However, DMF Director McKiernan later expressly admitted that "the purpose of the v-notch rule is standardization within the LCMA." [Adams Decl. Ex. E at 7.] Even if the V-Notch rule were meant to increase the spawning stock biomass, there is no evidence it would meaningfully do so. [*See* Adams Decl. Ex. A; Ex. B.] On the contrary, a report authored by two DMF biologists—Bruce Estrella and Robert Glenn, now DMF's Deputy Director—indicated that the previous OCC regulations permitting a larger gauge size and V-Notched catches actually led to a *greater* increase in spawning stock biomass than a broader V-Notch prohibition coupled with smaller (or no) gauge size requirements. [Adams Decl. Ex. A.] Moreover, DMF's then-director Philip Coates stated outright that "we're not going to save the lobster resource with v-notching and a maximum gauge." [Adams Decl. Ex. B.]

Relying on its experience and specialized knowledge, DMF determined decades ago that V-Notching does not meaningfully increase the spawning stock biomass and indeed is less effective than the OCC's existing regulations. [Adams Decl. Ex. A.] Perhaps recognizing the lack of evidence that V-Notching has any conservation value, DMF now seeks to impose a sweeping V-Notching prohibition

---

'comparable' and have the 'broad, remedial purpose of…(providing) comprehensively for procedural due process in administrative proceedings.'").

[2]   Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *R & B Transp., LLC v. U.S. Dep't of Labor Admin. Rev. Bd.*, 618 F.3d 37, 44 (1st Cir. 2010). But "the APA's two linguistic formulations amount to a single substantive standard of review." *Dolan v. Fed. Emergency Mgmt. Agency*, 760 F. Supp. 3d 1200, 1217–18 (D.N.M. 2024) (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys.*, 45 F.2d 677, 683-84 (D.C. Cir. 1984) (Scalia, J.) (explaining that, as to factual findings, "there is no <u>substantive</u> difference between what [the arbitrary-or-capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense") (emphasis in original)).

13

merely to standardize fishing rules within the OCC and between the other LCMA, despite Director McKiernan's acknowledgment that the OCC "is a unique lobster fishery." [Adams Decl. Ex. E, at 5.]

Absent any evidence that V-Notching will further conservation efforts, DMF's attempt to impose new V-Notch requirements on the OCC is arbitrary and capricious. *Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023) (citations omitted) ("An agency's decision is arbitrary and capricious if the agency…disregarded 'an important aspect of the problem [or] offered an explanation that runs counter to the evidence.'"). Ensuring conformity of fishing regulations alone is not a rational basis for discarding the OCC Settlement that has been in place for 25 years and in that time has effectively contributed to spawning stock conservation, especially since DMF cites no reason why it believes the new V-Notch rule is now necessary to further conservation efforts. [*See* Adams Decl. Ex. A; Ex. B.]; *Brewer v. Madigan*, 945 F.2d 449, 457 (1st Cir. 1991) (citation omitted) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change."); *see also California v. U.S. Dep't of Ed.*, --- F. Supp.3d ----, 2025 WL 760825, at *3 (D. Mass. 2025) (cleaned up) ("[I]f an agency's new policy rests upon factual findings that contradict those which underlay its prior policy…an agency's failure to consider such factors would be arbitrary or capricious."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation omitted) (holding that when an agency effects a change in policy, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

Moreover, there are only 40 "state-only" lobstermen in the OCC who have been subject to the previous V-Notch requirement. [Adams Decl. Ex. E, at 5-6.]. It is patently unreasonable to suggest that requiring these 40 individuals to submit to the new V-Notch rule will have an appreciable impact on lobster conservation, especially since longstanding science has demonstrated that the existing rule governing the OCC lobstermen is more effective toward achieving that end. [Adams Decl. Ex. A.]; *see Gulluni*, 85 F.4th at 82.  In essence, DMF claims that imposing a less effective conservation measure

14

on a small fraction of the Massachusetts lobster fishery will meaningfully protect the lobster stock. That is pure fantasy.

The "facts and circumstances" of the present case unequivocally demonstrate the futility of 322 CMR 6.02. *Encino Motorcars, LLC*, 579 U.S. at 222. The new rule was promulgated in complete disregard of the underlying circumstances and is arbitrary and capricious. *Id.* Because 322 CMR 6.02 is arbitrary, capricious, and completely lacking evidentiary support, it violates the Administrative Procedure Act, and this Court must enjoin its enforcement.

**B. Plaintiffs Will Suffer Irreparable Harm if 322 CMR 6.02 Takes Effect Because They Have No Legal Remedy for the Damages They Will Incur.**

To establish irreparable harm, a plaintiff must show that "in the absence of injunctive relief, she will sustain harm that cannot be recompensed by money damages." *Bear, Stearns & Co., Inc. v. Sharon*, 550 F.Supp.2d 174, 178 (D. Mass. 2008) (internal quotations omitted); *see also Stonestreet v. Kreppel*, No. CIV.A 09-11580-PBS, 2010 WL 972203, at *4 (D. Mass. Mar. 10, 2010) (same). Here, Plaintiff's members will suffer a significant reduction in their lobster catch under the new V-Notch prohibition, which in turn will cause a significant monetary loss. [Adams Decl. ¶¶ 32-34.] But, significantly, Plaintiff's members are unable to recover that loss at final judgment. *See* 5 U.S.C. § 702; *Sibley v. Ball*, 924 F.2d 25, 28 (1st Cir. 1991) (holding that Administrative Procedure Act's sovereign immunity waiver "exclude[s] money judgments.").

Plaintiff's members only recourse is to seek equitable relief in the form of an injunction or declaratory judgment. *Sibley*, 924 F.2d at 28. Because Plaintiff's members cannot seek money damages, their harm is per se irreparable. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 19 (1st Cir. 2000) ("If the plaintiff suffers a substantial injury that is not…adequately compensable by money damages, irreparable harm is a natural sequel."); *cf. K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989) ("[I]f money damages will fully alleviate harm, then the harm cannot be said to be irreparable.").

15

Even if Plaintiff's members were entitled to recover damages, their harm is irreparable because 322 CMR 6.02 will cause a significant reduction in Plaintiff's members lobster catch, which will destroy their business.[3] [Adams Decl. ¶¶ 32-34;] *see Oyster Techs., Ltd. v. Env't Devs. Grp., LLC*, 2011 WL 6213747, at *2 (D. Mass. Dec. 13, 2011) ("Where there is a risk of loss or destruction of a business entity, courts have held that injunctive relief is appropriate."). Not only would this mean that Plaintiff's members could no longer support themselves; they would be forced out of an industry that forms part of the very fabric of the Commonwealth's culture and to which they have dedicated decades of service and would no longer be able to make dues payments to Plaintiff. [Adams Decl. ¶¶ 32-34.] That is a harm in itself. *See, e.g., Mello Const., Inc. v. Div. of Cap. Asset Mgmt.*, 84 Mass. App. Ct. 625, 630, 999 N.E.2d 1091, 1096 (2013) ("The loss of a license may have devastating financial and emotional consequences").[4]

To be clear, Plaintiff's members harm is irreparable because they have no right to recovery at law, nor does Plaintiff. *Ross-Simons of Warwick, Inc.*, 217 F.3d at 19. But even if it had, the changes to 322 CMR 6.02 threaten to destroy its members' businesses. [Adams Decl. ¶¶ 32-34.] That is itself enough to constitute irreparable harm (to say nothing of the emotional consequences of such a loss). *Ross-Simons of Warwick, Inc.*, 217 F.3d at 19. This Court must enjoin 322 CMR 6.02 to stave off the irreparable injury that is sure to follow.

---

[3] DMF has informally contended that this number is 2%. Even if this laughable underassessment were accurate, it would not change that Plaintiff's members are irreparably harmed because they have no recourse to recover the profits reflected by the lost 2%.

[4] Notably, Plaintiff's members have no Takings claim either, as they have no property interest in their fishing licenses. *Fishermen's Finest Inc. v. United States*, 59 F.4th 1269 (Fed. Cir. 2023) (holding that fishermen licensed by the federal government to fish in federal waters have no Fifth Amendment property interest in their licenses and permits, nor any compensable property interest in using vessel to harvest and process fish in management areas.)

C. **The Balance of Harms and Public Interest Weigh in Plaintiff's Favor Because 322 CMR 6.02 Will Destroy Plaintiff's Members Business Without Furthering Conservation of the Lobster Stock.**

In addition to demonstrating likelihood of success on the merits and irreparable harm, a plaintiff seeking a preliminary injunction must show that "the injury he will incur if injunctive relief is not granted will outweigh the harm which granting the injunctive relief would inflict on defendants" and that the "public interest favors an injunction." *7-Eleven, Inc. v. Grewal*, 60 F. Supp.3d 272, 279 (D. Mass. 2014) (citation omitted).

Without an injunction, Plaintiff's members will experience a significant reduction in their lobster catch and are likely to lose their businesses. [Adams Decl. ¶¶ 32-34.] Conversely, if 322 CMR 6.02 is enjoined, Plaintiff's members livelihoods may well be saved from total ruin. *See id.* As for the Defendants, their supposed harm upon issuance of an injunction is that at most 40 lobstermen will be permitted to continue fishing most V-Notched lobsters. [*See* Compl. Ex. E, at 5-6.] In other words, Defendants' position absent an injunction will be that which they have comfortably occupied for the last 22 years without incident. Compared to the devastating financial impact Plaintiff's members will suffer if 322 CMR 6.02 is not enjoined, Defendants' risk of harm is negligible at best. *See Oyster Techs., Ltd.*, 2011 WL 6213747, at *2. This is especially true given that the challenged rule is illegal in the first place. *See* 16 U.S.C. § 5104(a)(1); *see also Massachusetts v. NIH*, --- F. Supp.3d ----, 2025 WL 702163, at *32 (D. Mass. 2025) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)) ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'").

Defendants may argue that an injunction will cause them irreparable harm because the Massachusetts lobster fishery could be suspended altogether for failure to comply with Addendum XXVII. *See* 16 U.S.C. § 5106(c); *Rhode Island Fishermen's Alliance, Inc. v. Rhode Island Dep't of Env't Mgmt.*, 585 F.3d 42, 46 (1st Cir. 2009). That argument is unavailing because ASMFC has neither constitutional nor statutory authority to compel such compliance in the first place. *Printz v. United*

17

*States*, 521 U.S. 898, 935 (1997). Addendum XXVII is a blatant act of commandeering, promulgated in open disregard of the Constitution and required statutory procedure. *See id.*; *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002). Given its glaring illegality, Addendum XXVII cannot serve as the basis for a moratorium, and Defendants therefore are not subject to a risk of irreparable harm under the injunction Plaintiff seeks. *Printz*, 521 U.S. at 935.

As for the public interest, it is not clear what interest Defendants purport to advance through 322 CMR 6.02. If indeed they wish to protect the lobster spawning stock, they have already admitted that the new rule will not further that goal. [*See* Adams Decl. Ex. A; Ex. B.] Moreover, DMF Director McKiernan has said that the rule is simply meant to standardize the rules governing LCMA. [Adams Decl. Ex. E, at 7.] Whatever its purpose, 322 CMR 6.02 cannot serve the public interest because it was promulgated through an illegal act of commandeering and in flagrant disregard of governing law. *See Somerville Public Schools v. McMahon*, --- F.4th ----, 2025 WL 1576570, at *8 (1st Cir. 2025) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) ("[T]here is generally no public interest in the perpetuation of unlawful agency action."). Rather than adversely affecting the public, the injunction Plaintiff seeks will serve the public's interest in having its government follow the law. *Newby*, 838 F.3d at 12 ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") Thus, both the balance of harms and the public interest weigh strongly in Plaintiff's favor.

## **CONCLUSION**

In 2000, the Commonwealth agreed to allow lobstermen in the OCC to fish V-Notched lobsters, a practice that is lawful, sustainable, and, until recently, uncontroversial. Now, Defendants have reversed course, seeking for the first time in decades to impose new restrictions on OCC lobstermen that threaten their ability to earn a living. Defendants do this, not out of any legitimate concern for lobster conservation, but as a result of a new ASMFC directive that violates federal law and the Tenth Amendment of the U.S. Constitution. Though DMF itself long ago acknowledged the trivial impact

that V-Notching has on the preservation of the lobster stock, Defendants nevertheless insist on imposing changes to 322 CMR 6.02, asserting merely that uniformity across LCMA is a desirable result. Defendants' actions are arbitrary, capricious, and completely lacking in evidentiary support. As such, they are in plain violation of the Massachusetts Administrative Procedure Act, M.G.L. c. 30A.

The harm Plaintiffs now confront is irreparable absent an injunction, while Defendants will not suffer any adverse effects if an injunction is granted. Defendants have acted illegally, and in so doing have threatened to destroy Plaintiff's members' very livelihood. This Court cannot allow such an injustice. Accordingly, Plaintiff respectfully requests this Court grant their Motion for Temporary Restraining Order and Preliminary Injunction/Administrative Stay pursuant to the Administrative Procedure Act and grant such other relief which is just and equitable.

**WHEREFORE,** Plaintiff, Outer Cape Lobstermen's Association, respectfully request that this Honorable Court:

1. Issue a Temporary Restraining Order enjoining Defendants from enforcing the amendments to 322 CMR 6.02 as applied to state-licensed lobstermen fishing in Outer Cape Cod LCMA, including the prohibition on harvesting V-Notched lobsters;

2. Grant a Preliminary Injunction restraining Defendants from implementing or enforcing the challenged amendments pending final resolution of this action;

3. Enter an Administrative Stay pursuant to 5 U.S.C. § 705 staying enforcement of the amendments to 322 CMR 6.02 pending judicial review;

4. Declare that the amendments to 322 CMR 6.02 are unlawful and unenforceable as arbitrary, capricious, unsupported by substantial evidence, contrary to the Administrative Procedure Act, and in violation of federal and constitutional law;

5. Award Plaintiff his costs and reasonable attorneys' fees incurred in connection with this action; and

6. Grant such other and further relief as the Court deems just and proper.

|  |  |
|---|---|
|  | Plaintiff Outer Cape Lobstermen's Association,<br>By its attorneys, |
| Dated: June 20, 2025 | /s/ SAMUEL P. BLATCHLEY<br>Samuel P. Blatchley, Esq. (BBO #670232)<br>Eckland & Blando LLP<br>555 Pleasant Street<br>Office #3B<br>New Bedford, MA 02740<br>(617) 217-6936<br>sblatchley@ecklandblando.com<br><br>Robert T. Dube Jr. (*pro hac vice* pending)<br>Eckland & Blando LLP<br>10 South Fifth Street<br>Suite 800<br>Minneapolis, MN 55402<br>(612)-236-0175<br>rdube@ecklandblando.com |

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

I hereby certify that I conferred with opposing counsel and I understand that the Defendants oppose the relief sought in this Motion. I further certify that Plaintiff, Stephen Smith, joins in requesting the relief sought in this Motion. Lastly and regrettably, I wish to confirm that I am informed and believe that Plaintiff, Brian Gibbons, is deceased.

/s/SAMUEL P. BLATCHLEY

### CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2025 a copy of the foregoing was filed through the CM/ECF system, and it is available for viewing and downloading from the CM/ECF system such that all appearing counsel have been served with this document by electronic means.

Further, this document will be emailed to Sean Donahue, Esq. at sean@donahuegoldberg.com, who has informed me by email that he represents the ASMFC in this matter.

/s/SAMUEL P. BLATCHLEY