UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OUTER CAPE LOBSTERMEN'S ASSOCIATION; BRIAN GIBBONS; STEPHEN SMITH; EAST COAST FISHERIES FEDERATION,<br><br>Plaintiff,<br><br>v.<br><br>ATLANTIC STATES MARINE FISHERIES COMMISSION; PHILIP COATES, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE MASSACHUSETTS DIVISION OF MARINE FISHERIES,<br><br>Defendants. | CIVIL ACTION<br>NO. 1:98-cv-10165-WGY |

**DEFENDANTS' STATUS REPORT**

Defendants Atlantic States Marine Fisheries Commission (ASMFC) and Daniel McKiernan, Director of the Massachusetts Division of Marine Fisheries (DMF),[1] provide this report to apprise the Court of the status of this case and related proceedings, in advance of the forthcoming June 23 hearing. Additionally, although Defendants will later respond with full briefing to address Plaintiff's June 20 motion for injunctive relief, Defendants summarize herein some of the reasons why the Court should take no immediate action in this long-dormant case— which encompasses no operative claim directed to the recent DMF regulations that Plaintiffs now seek to enjoin. Instead, this case should either be dismissed or, at most, remain stayed while

---

[1] Philip Coates, who was named as a defendant in his capacity as the Director of DMF, is no longer the acting Director. Pursuant to Fed. R. Civ. P. 25(d), the current Director, Daniel McKiernan, should be automatically substituted for him.

1

the dispute over those regulations plays out in state court, where Plaintiffs have already coordinated a separate effort to obtain the same relief they seek here.

> A. **This 27-Year-Old Case Concerns a Fishery Management Plan Amendment Adopted by ASMFC in 1997—Not the DMF Regulations Plaintiffs Now Seek to Enjoin.**

ASMFC is a commission created by an interstate compact among fifteen states, Pub. L. 77-539 (1942), *as amended*, Pub. L. 81-721 (1950), which Congress subsequently recognized as a part of the cooperative management regime for Atlantic Coastal fisheries. *See Rhode Island Fishermen's All., Inc. v. Rhode Island Dep't of Env't Mgmt.*, 585 F.3d 42, 46 (1st Cir. 2009) (providing background on ASMFC). ASMFC prepares and adopts fishery management plans, which its member states then implement through state laws and regulations. *See id.*

In 1997, ASMFC adopted Amendment 3 to the Interstate Fishery Management Plan for American Lobster. *See id.* Among various other conservation efforts reflected in the plan, it required a "[p]rohibition on possession of V-notched female lobsters," i.e., female lobsters that have marked with a notch in their tails in order to designate them as unavailable for harvesting. *See* Amendment 3 to the Interstate Fishery Management Plan, at 20 (December 1997), *available at* https://asmfc.org/wp-content/uploads/2025/01/lobsterAmendment3.pdf. More specifically, that prohibition applied to "any female lobster bearing a . . . straight-sided triangular cut without setal hairs, at least 1/4 inch in depth and tapering to a sharp point" on its right-of-center tail flipper. *Id.* That practice preserves egg-bearing female lobsters, and as a result, helps preserve the size of the lobster population.

Plaintiffs filed this lawsuit against ASMFC on January 29, 1998, arguing that Amendment 3 was unlawful because it supposedly violated the Magnuson-Stevens Fishery Conservation and Management Act and was arbitrary and capricious. *See* Ex. 1, First Amended Complaint, Dkt. 3, at ¶¶ 20–21 (June 25, 1998). Plaintiffs later amended their pleadings on May

2

26, 1999, to add DMF's Director as a defendant and added a claim (Count II) based on a theory that Amendment 3 and provisions of the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101, *et seq.*, were unconstitutional because they purportedly violate anti-commandeering principles.  *See* Ex. 2, Second Amended Complaint, Dkt. 22, at pp. 9–11 (May 26, 1999).  Count II included a request for injunctive relief against Director Coates's enforcement of the provisions of Amendment 3 (though the Second Amended Complaint did not challenge any DMF regulation).  *See* Ex. 2, Second Amended Complaint, Dkt. 22, at pp. 9–11 (May 26, 1999).

DMF and ASMFC both moved to dismiss the Second Amended Complaint.  *See* Motion by ASMFC to Dismiss, Dkt. 29 (Oct. 4, 1999); Motion to Dismiss by Philip Coates, Dkt. 34 (Oct. 4, 1999).  The Court granted the motions in part and denied them in part, dismissing Count II (the only claim that encompassed any request for relief directed to DMF), while declining to dismiss Count I.  *See* Dkt. 43 (Dec. 2, 1999).

Accordingly, the operative pleading in this case includes only a single claim directed to ASMFC.  And it concerns only Amendment 3, which was adopted in 1997—not the recent DMF regulations Plaintiffs now ask the Court to enjoin (or any other DMF regulations, for that matter).

      **B.**    **After the Parties Mediated, the Court Administratively Closed This Case, But There Is No Evidence of the Settlement Agreement Plaintiffs Now Cite.**

After the Court ruled on Defendants' motion to dismiss, the parties engaged in mediation.  *See* Dkt. 46 (notice of "ADR Conference" scheduled for February 28, 2000).  And following mediation, the Court entered an order staying and administratively closing the case.  *See* Dkt. 54 (July 19, 2000).  Based on the records Defendants have been able to locate in the very limited time since Plaintiffs sought to reopen this case, it is not yet clear precisely what led to that stay.

However, Plaintiffs' assertion that the parties entered into a settlement agreement that somehow prohibits DMF's recent regulations is unsubstantiated. *See* Memorandum in Support of Emergency Motion to Reopen Case, Dkt. 58, at 1 (June 17, 2025) (arguing DMF has "gone back on its word" from settlement discussions by promulgating the recent regulations). It is also highly dubious, for several reasons.

For one, Plaintiffs have failed to provide any written settlement agreement or any other documentary evidence of what agreement was supposedly reached. Plaintiffs have also failed to provide any explanation as to why a settlement would not have been reduced to writing.

Moreover, even assuming the parties reached some sort of administrative resolution, the regulatory history belies Plaintiffs' assertion that DMF agreed to "permit[] [Plaintiffs] to fish V-notched lobster." Memorandum in Support of Emergency Motion to Reopen Case, Dkt. 58, at 3 (June 17, 2025). In 2000, the same year that agreement was supposedly reached, DMF promulgated a regulation making it "unlawful for any person to possess any v-notched female lobsters," defined to encompass any female lobster marked on its tail with "a straight-sided triangular cut without setal hairs at least 1/4 inch in depth and tapering to a sharp point." Ex. 3, 322 C.M.R. 6.02(3) (2000). And that regulation has been in effect, with minor changes, ever since. *See, e.g.*, Ex. 8, 322 C.M.R. 6.02(5)(e)(3) (2024) (prohibiting possession of lobsters bearing v-notch at least 1/4 inch in size in the Outer Cape Cod LCMA).

Notably, the regulation that was promulgated in 2000 and that remained in effect for the past 25 years is substantively almost identical to what appeared in Amendment 3. *Compare* Ex. 3, 322 C.M.R. 6.02(3) (2000) (prohibiting possession of lobster bearing v-notch at least 1/4 inch in size, without setal hairs), *with* Second Amended Complaint ¶ 14 (excerpting challenged portion of Amendment 3, which prohibited possession of lobster bearing quarter-inch v-notch without setal hairs). In other words, the regulation DMF promulgated around the same time the

4

parties supposedly settled is *precisely the same* as the one Plaintiffs had challenged in this lawsuit—which strongly suggests DMF made no concession or compromise pertaining to possession of v-notched lobsters. If they had, presumably Plaintiffs would have objected to the existing regulations long before now.

### C. DMF Recently Revised Its Regulation to Make It Slightly More Stringent.

On January 3, 2025, DMF promulgated the final version of the regulations that Plaintiff now seeks to challenge. *See* Ex. 4, 1538 Mass. Reg. 89 (Jan. 3, 2025). Among other changes, these regulations modify the prohibition on possession of v-notched lobsters in an area known as the Outer Cape Cod LCMA ("OCCLCMA") to make the prohibition slightly more stringent. While the prior regulation prohibited possession of a lobster bearing a v-notch that is at least *1/4* inch in size *without* setal hairs, the new regulation prohibits possession of a lobster bearing a v-notch that is *1/8* inch in size, *with or* without setal hairs. *See* Ex. 5, 322 C.M.R. 6.02(5)(d)(3)(b). (Because a v-notch will shrink over time as a lobster molts, a lower threshold for the v-notch prohibition has the effect of increasing the amount of time that a v-notched lobster may not be harvested—and thereby increasing egg production.) DMF promulgated this regulation following a recent addendum to the FMP issued by ASMFC that recommended the change. The new v-notch standard that applies to the OCCLCMA goes into effect on July 1, 2025.

The new standard that applies to the OCCLCMA does not reflect any sweeping change with respect to practices of harvesting v-notched lobsters. Instead, it merely makes the rule that applies to the OCCLCMA more uniform with the rules that apply in other fisheries, which, before this regulation, applied a stricter standard than the rule that applied in the OCCLCMA.

### D. Plaintiffs Challenge DMF's Regulations in State Court, While Seeking Parallel Relief in This Federal Action.

On June 4, 2025, Dana Pazolt—a lobsterman who is represented by the same counsel representing Plaintiffs here and who is presumably a member of the lead organizational plaintiff in this action—filed a lawsuit in Massachusetts Superior Court challenging DMF's recent regulations, arguing that they are arbitrary and capricious under state law. *See* Ex. 6 (Superior Court Complaint). Two weeks later, on June 17, 2025, Pazolt filed a motion for a preliminary injunction in that state-court action. *See* Ex. 7 (Superior Court Motion for Preliminary Injunction).

On the same day that Pazolt sought a preliminary injunction in state court, Plaintiffs filed their emergency motion to reopen this case—without first contacting DMF's counsel or otherwise making any attempt to meet and confer—arguing that they should be allowed to challenge the same regulations here too. *See* Memorandum in Support of Emergency Motion to Reopen Case, Dkt. 58 (June 17, 2025). Three days later, on June 20, Plaintiffs also filed a motion for a preliminary injunction in this case that sought relief identical to that sought by Pazolt in state court. *Compare* Ex. 7 (Superior Court Motion for Preliminary Injunction), *with* Dkt. 68 (Plaintiff's Motion for Preliminary Injunction).

### E. There Is No Meritorious Basis for the Relief Plaintiffs Seek and No Apparent Reason It Should Be Litigated as Part of This Case.

Plaintiffs should not be allowed to shoehorn DMF's recent regulations into this case. As will be described more fully in Defendants' forthcoming oppositions to Plaintiffs' motion for a preliminary injunction, Plaintiffs' claims have fatal legal defects, including that none of them can be litigated in federal court.

6

1. **The Operative Complaint Does Not Encompass the Relief Plaintiffs Now Seek.**

Most fundamentally, this lawsuit does not include a claim challenging the regulations Plaintiffs now ask the Court to enjoin. As described above, the pleadings in this action never even included any claim directed to any DMF regulations. *See supra* at pp. 2-3. And after the Court dismissed Count II, it appears there is not even any live claim that seeks *any* type of relief against DMF. *See supra* at pp. 3. If Plaintiffs wish to challenge DMF's regulations, they must do so in state court for the reasons explained below. And even if Plaintiffs could challenge DMF's regulations in federal court, there is no reason that challenge should be litigated as a part of this action, rather than a new lawsuit.

2. **The Eleventh Amendment Precludes Plaintiffs from Asserting Their Primary Argument in Federal Court.**

Plaintiffs' primary argument about the alleged unlawfulness of DMF's regulations is based on state law. That is, Plaintiffs assert that DMF's regulations are "arbitrary and capricious or unsupported by substantial evidence." Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, Dkt. 69, at 12 (June 20, 2025).[2] But the Eleventh Amendment prohibits federal courts from adjudicating claims against state officials that are predicated on state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

---

[2] Plaintiffs cite the federal Administrative Procedure Act for their arguments relating to the DMF, but presumably they mean to cite Massachusetts's Administrative Procedure Act, as the federal APA applies only to federal agencies. *See, e.g.*, 5 U.S.C. § 701(b) (defining "agency" to mean "each authority of the Government of the United States").

### 3. Plaintiffs' Only Arguments Based on Federal Law Are Incoherent as Applied to DMF and Its Regulations.

While Plaintiffs assert some arguments based on federal law, they are nonsensical as applied to DMF. For example, Plaintiffs assert that DMF's regulations violate the Tenth Amendment because they are the result of unconstitutional commandeering *by the federal government*—i.e., Plaintiffs contend DMF violated the Tenth Amendment by allowing itself to be unconstitutionally forced by the federal government to promulgate the regulations. *See* Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, Dkt. 69, at 7 (June 20, 2025). But, of course, the Tenth Amendment is a limit on the *federal government* meant to *protect states*. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471, 138 S. Ct. 1461, 1476, 200 L. Ed. 2d 854 (2018) ("The anticommandeering doctrine . . . represents the recognition of [a] limit on *congressional authority*." (emphasis added)). Thus, the notion that a *state* can violate anticommandeering principles under the Tenth Amendment is implausible.

### 4. Insofar as Plaintiffs Seek to Challenge ASMFC's Recent Addendum to the FMP, Plaintiffs Lack Standing.

ASMFC does not regulate fishing activity. Rather, ASMFC develops interstate fishery management plans that are implemented by member states through their individual state legislation or regulatory processes. Under the ASMFC Compact, moreover, member states have undiminished authority to adopt and enforce measures not required by, or more stringent than, Commission's interstate management plan.[3] This arrangement has implications for Article III standing. As the Fourth Circuit recently confirmed, plaintiffs seeking to challenge an ASMFC

---

[3] ASMFC Compact, Article IX ("Nothing in this compact shall be construed to limit the powers of any signatory state or to repeal or prevent the enactment of any legislation or the enforcement of any requirement by any signatory state imposing additional conditions and restrictions to conserve its fisheries.").

plan cannot establish standing without "plausibly alleging" that the state whose laws actually regulates plaintiffs' activity would "likely" respond to an order enjoining the Commission plan by changing the regulation in question:

> But [plaintiffs] are regulated by Maryland, not the Commission. So, to have standing to enjoin the Commission's actions, Plaintiffs must show that doing so will change how Maryland regulates them. Where choices by an "independent actor[ ]" are involved—here, the sovereign state of Maryland—Plaintiffs face the "difficult" burden of showing how Maryland would respond if the Commission's Addendum II were enjoined. *Lujan* [*v. Defenders of Wildlife,* 504 U.S. 555, 562 (1992)]. In other words, Plaintiffs must plausibly allege that Maryland would likely rescind its one-fish limit on charter boats if the district court enjoined Addendum II. They have not done so.

*Delmarva Fisheries Assoc., Inc. v. ASMFC*, 127 F.4th 509, 515 (4th Cir. 2025) (footnote omitted). Plaintiffs lack standing here on similar grounds.

### 5. Any Purported Urgency in Resolving Plaintiffs' Dispute Is the Result of Plaintiffs' Own Delay.

In addition to being unmeritorious, Plaintiffs' demands for emergency relief are untimely. As described above, DMF promulgated the challenged v-notching regulation more than five months ago, on January 3, 2025. *See supra* at pp. 5. Yet Plaintiffs waited until less than two weeks before that regulation goes into effect to ask this Court for emergency intervention. In light of that unexcused delay, Plaintiffs should not be granted any form of preliminary relief.

Respectfully Submitted,

ATLANTIC STATES MARINE FISHERIES
COMMISSION

By its attorneys,

*/s/ Sean H. Donahue*
Sean H. Donahue (Admitted pro hac vice)
Megan M. Herzog (BBO No. 682948)

        Donahue, Goldberg & Herzog
        1008 Pennsylvania Ave., SE
        Washington, D.C. 20003
        (202) 277-7085
        sean@donahuegoldberg.com
        megan@donahuegoldberg.com


DANIEL MCKIERNAN,
DIRECTOR OF THE MASSACHUSETTS
DIVISION OF MARINE FISHERIES

By his attorneys,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/ Aaron Macris*
Aaron Macris (BBO# 696323)
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2987
aaron.macris@mass.gov

Dated:  June 22, 2025

**CERTIFICATE OF SERVICE**

      I hereby certify that, on June 22, 2025, I caused this Status Report to be served through the Court's electronic filing system and by email upon the following contacts:

Samuel P. Blatchley, Esq.
555 Pleasant Street, Unit 3B
New Bedford, MA 02740
(617) 217-6936
sblatchley@ecklandblando.com

Robert T. Dube, Jr., Esq.
10 South Fifth St., Suite 800
Minneapolis, MN 55402
(612) 236-0160
rdube@ecklandblando.com